UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CASE NO.:

CLARICE M. MIDDLETON,

                Plaintiff,

vs.

WELLS FARGO BANK, N.A.,

                Defendant.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

1. Banking while black—that was Ms. Middleton's crime. Ms. Middleton's story is just another chapter in the tragic tale of the weaponization of 911. Ms. Middleton went to a Wells Fargo branch in a predominantly "white" part of Atlanta to cash a $200.00 corporate check that was drawn on a Wells Fargo account. Wells Fargo responded by accusing Ms. Middleton of fraud. Ms. Middleton attempted to rebut Wells Fargo's baseless accusation by offering all forms of identification at her disposal, as well as the check-stub from which Ms. Middleton had detached the check. Not enough for Wells Fargo, who called the police to interrogate Ms. Middleton, and treated her like a common criminal for absolutely no reason other than the color of her skin and deeply held prejudices. It took accusations, humiliation and an interrogation by the police before Wells Fargo cashed Ms. Middleton's check—which would have been done for any white customer without delay.

The discrimination endured by Ms. Middleton is neither unique nor shocking—it is the pattern and practice of modern American corporations. Despite an outwardly progressive stance, Wells Fargo, like other American corporations, is quick to call on law enforcement to handle any

1 | P a g e

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Fort Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

black customer it chooses not to serve, or be suspicious of, solely due to the customer's skin color.

And so, Plaintiff CLARICE M. MIDDLETON ("Ms. Middleton") sues Defendant WELLS FARGO BANK, N.A. ("Wells Fargo"), and states

## JURISDICTION

2. This is an action against Wells Fargo to recover damages pursuant to Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.*, as amended, ("Section 1981").

3. Jurisdiction of this Court arises under 28 U.S.C. § 1331 because the Complaint alleges a federal claim and requires the resolution of substantial questions of federal law.

4. Under 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Ms. Middleton's state law claims because the state claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

5. Further, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because: (a) Ms. Middleton and Wells Fargo are citizens of different states; and (b) the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. This Court has personal jurisdiction over Wells Fargo because: (a) Wells Fargo is operating, present, and doing business within this jurisdiction, and (b) Wells Fargo's breaches and illicit activity occurred within this jurisdiction.

7. Venue in this District is proper under 28 U.S.C. § 1391(b) because all of the events and omissions complained of took place in the Northern District of Georgia.

## PARTIES

8. Ms. Middleton is a citizen of the United States, a resident of the State of Georgia, and a person with standing to bring a claim under Section 1981.

9. Ms. Middleton is a 39-year-old woman of African-American descent.

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

10. Wells Fargo is a subsidiary of Wells Fargo & Company.

11. Wells Fargo designates its main office in Sioux Falls, South Dakota, and is a citizen of South Dakota for diversity purposes.

12. Wells Fargo is a result of a merger between Wells Fargo & Company, Norwest Corporation, and Wachovia.

13. According to Wells Fargo's recent quarterly report, Wells Fargo provides banking, investment, and mortgage products and services, as well as consumer and commercial finance, through Wells Fargo's 7,950 locations and 13,000 automated tellers. Wells Fargo has over 70 million customers globally. Ms. Middleton was simply hoping to be treated the same way as the many other millions of Wells Fargo customers.

14. Along with Bank of America, Citigroup, and JPMorgan Chase, Wells Fargo is one of the "Big Four Banks" in the United States.

## BACKGROUND AND GENERAL ALLEGATIONS

15. Wells Fargo serves the needs of individuals seeking personal banking, provides services to small businesses, as well as offers commercial banking solutions.

16. As part of its small business services, Wells Fargo offers business checking accounts. As part of its business checking account services, Wells Fargo offers its business customers the convenience of paying vendors, employees, and all other persons and/or entities, via paper check, the amount of which is deducted directly from the business consumer's account.

17. Wells Fargo defines "check" as "[a] written order you have authorized instructing the bank to pay a specific person or entity a specified amount of money from your account.[1]"

---

[1] *See* https://www.wellsfargo.com/help/checking-savings/glossary/ (last visited November 25, 2019).

3 | Page

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

18. Customers can choose from various styles of checks sold by Harland Clarke Corp., all of which come with multiple security features to prevent fraud. In fact, Wells Fargo boasts that its "High Security Laser Check has more than 25 security features to help protect your business from check fraud."[2]

19. Wells Fargo allows account holders, as well as non-account holders, to cash checks drawn from a Wells Fargo account at local Wells Fargo branches. As stated in the Los Angeles Times, circa 2017, Wells Fargo charges non-customers a $7.50 fee that, according to a Wells Fargo spokesman "is intended to cover the costs of offering our convenient network of branches and bankers to non-customers."[3]

20. Wells Fargo even settled a class action filed by Chaffee Enterprises of Bakersfield ("CEB") in California Superior Court (Case No. BC314198) that alleged Wells Fargo's policy of charging non-customers money for each check cashed violated California labor law, which required that certain employees have the ability to cash paychecks at their full face value. The paychecks that CBE provided to its employees were drawn on a Wells Fargo account. In 2004, Wells Fargo began charging CBE's employees for cashing paychecks at Wells Fargo branches. Following the settlement, Wells Fargo spokeswoman, Julia Tunis, confirmed Wells Fargo will not stop charging a check-cashing fee to those without accounts with the bank.

21. At bottom, Wells Fargo offered to the general public the option of walking into any of its branches and cashing a check drawn upon a Wells Fargo account.

### Ms. Middleton attempts to cash her check

---

[2] *See* https://www08.wellsfargomedia.com/assets/pdf/small-business/business-checks.pdf (last visited November 25, 2019).
[3] *See* https://www.latimes.com/business/lazarus/la-fi-lazarus-bank-check-cashing-fees-20170721-story.html (last visited November 25, 2019).

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

22. In or about November of 2018, Ms. Middleton moved out of her apartment in Lithonia, in eastern DeKalb County, Georgia.

23. On December 18, 2018, Ms. Middleton received a security deposit refund check from Mercy Housing, Inc. in the amount of $200.00. The check was drawn on a Wells Fargo account and was made payable directly to Ms. Middleton.

24. A true and correct copy of the check (after it was finally cashed) is below:



25. All information contained on the check, including the payee information, was printed directly onto the check. The check was issued by Mercy Housing, Inc. to Ms. Middleton in accordance with the lease agreement Ms. Middleton had entered into with Mercy Housing, Inc.

26. Ms. Middleton holds an associate's degree in both theology and criminal justice and is a choirmaster for a traveling gospel choir. Ms. Middleton is also an EMT. To make extra money, Ms. Middleton worked part-time as a driver for Uber.

27. On the morning of December 19, 2018, Ms. Middleton dropped an Uber passenger off around the Druid Hills neighborhood, one of Atlanta's most affluent neighborhoods.

28. According to the 2010 census, the Druid Hills area was 78.3% white, and only

5 | Page

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

7.7% black or African American[4]. The next neighborhood over is North Druid Hills which is 68.6% white and 14.3 % black or African American[5].

29. As Ms. Middleton was driving around the Emory University located between Druid Hills and North Druid Hills, she saw a Wells Fargo branch and decided to stop and cash her refund check as she needed the money to pay some bills.

30. Ms. Middleton stopped at the Wells Fargo branch located at 725 Houston Mill Road Northeast, Atlanta, Georgia 30329 (the "725-Branch"), to cash the Refund Check.

31. Prior to December 19, 2018, Ms. Middleton had cashed many checks at other banks, including other local Wells Fargo branches, without any issue. Ms. Middleton was expecting a seamless transaction, as she should—but, unfortunately—Ms. Middleton's expectations were too high.

32. On December 19, 2018, at approximately 9:30 A.M., Ms. Middleton entered the 725-Branch and queued with other patrons. At the signal of the teller, Ms. Middleton approached the counter, stated that she wanted to cash a check, and presented the Refund Check to the teller.

33. The teller responded by asking Ms. Middleton for two forms of identification, which Ms. Middleton promptly provided.

34. Ms. Middleton also complied with the teller's request that she endorse the back of the check, as well as to place her thumbprint on the check as well as can be seen in the middle of the check above.

35. After complying with the teller's instructions, Ms. Middleton began patiently

---

[4] https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=CF (last visited November 25, 2019).
[5] http://worldpopulationreview.com/us-cities/north-druid-hills-ga-population/ (last visited November 25, 2019).

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

waiting for the teller to process her transaction.

36. In addition to having cashed many checks, as a patron, at other banks, Ms. Middleton had also previously worked for Bank of America as a teller.

37. Ms. Middleton, familiar with the check cashing process at Wells Fargo and other banks, knew the process to be quick. Soon, however, Ms. Middleton noticed that, *this time*, something was different.

38. Instead of briefly inputting Ms. Middleton's information and a momentary delay, the teller was feverously typing at computer terminal; constantly looking up at Ms. Middleton with an expression of repugnance. After this continued for an unusual amount of time, Ms. Middleton curiously inquired as to whether everything was okay, to which the teller responded—in a reprimanding tone—that she (the teller) was checking whether the Refund Check was fraudulent.

39. Although shocked to hear such a response from the teller, Ms. Middleton knew the Refund Check was authentic and, at the time, had faith that the teller would soon reach this conclusion. To Ms. Middleton's complete shock, however, that is not what happened next.

40. After reprimanding Ms. Middleton, the teller continued the same conduct. Soon, though, and without explanation to notice to Ms. Middleton, the teller took Ms. Middleton's identification and the Refund Check and walked away from the counter. Ms. Middleton asked the teller where she was going with the Refund Check and her identification but was completely ignored. Bewildered, Ms. Middleton waited patiently.

41. After further delay, Ms. Middleton was confronted by Damian Mahoney the service manager of the 725-Branch. Without acknowledging Ms. Middleton's presence or inquires, Mr. Mahoney looked Ms. Middleton up-and-down, inspected the Refund Check, Ms. Middleton's identification, and exclaimed the Refund Check to be fraudulent. Stunned by Mr. Mahoney's

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

erroneous claim, Ms. Middleton offered to provide Wells Fargo which the paperwork associated with the Refund Check which she had in her pocket—to *prove* it was authentic and not otherwise fraudulent—but Ms. Middleton's attempts were in vain.

42. Wells Fargo also made and retained a copy of Ms. Middleton's identification and debit card without authority and against Ms. Middleton's will.

43. At this point, Blake Clark, the branch manager of the 725-Branch, confronted Ms. Middleton and instructed Mr. Mahoney to call the police. Thunder-struck by, not only the baseless claims of the agents of Wells Fargo—but, more critically—by Wells Fargo calling the police, Ms. Middleton began to fear for her safety, as the claims which Wells Fargo was now making, *i.e.*, that Ms. Middleton was a fraudster, although entirely baseless and erroneous, were extremely serious and, depending on how the situation with the police unfolded, potentially deadly for Ms. Middleton.

44. Mr. Clarke called 911 and informed the dispatcher that Ms. Middleton had "presented us a fraudulent check."

45. After calling the police, Mr. Mahoney and Mr. Clark demanded that Ms. Middleton leave the premises. Not wanting to flee, as she had done nothing wrong, Ms. Middleton exited the 725-Branch and, in the calmest manner possible, waited outside for the police to arrive.

46. In short order, Officer L. Anderson arrived at 725-Branch, and after a interrogation of Ms. Middleton and investigation, it was revealed that the Refund Check was, in fact, not fraudulent.

47. Wells Fargo did eventually cash Ms. Middleton's check. However, what should have been a simple transaction, instead, resulted in Wells Forgo questioning Ms. Middleton's moral integrity, accusations of fraud, an aggressive and unwarranted interrogation like a common

8 | P a g e

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

criminal, and Ms. Middleton suffering deep embarrassment and humiliation

48. Ms. Middleton was outraged, humiliated, and traumatized.

49. While neither the teller nor the managers of the Wells Fargo's Branch used any racial sluts or epithets, there is much more to discrimination than just verbal abuse. In her experience living as an African American, Ms. Middleton is able to identify when she is being discriminated against, even when there are no racial slurs hurled at her. Ms. Middleton has witnessed firsthand the differences in how white Americans are treated and how black Americans are treated. Ms. Middleton knew from the teller's facial expression, body language, tone, language, and attitude, that she was discriminating against her because of the color of her skin. Ms. Middleton's knowledge came as a result of nearly 40 years of experience with these issues. Based upon her knowledge and experience, the conduct Ms. Middleton was subjected to at Wells Fargo that day was undoubtedly as a result of racial discrimination, consistent with other acts of discrimination and racism to which she had been subjected to throughout her life.

50. No explanation, other than blatant discrimination, exists for the conduct of Wells Fargo. The subject check had substantial security features to protect from fraud and the signor of the check.

51. The Refund Check had security features to protect against fraud, forgery, and tampering, such as specialized paper, ink, watermarks, and designs. None of the security features of the Refund Check were triggered or gave any indication of fraud, forgery, or tampering. Ms. Middleton's name was printed on the face of the check as the payee and, at the request of Wells Fargo, produced two forms of identification and provided her thump print and signature. No explanation, other than blatant discrimination, exists for the conduct of Wells Fargo.

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

52. Mercy Housing, Inc. serves over 40,000 residents in 20 states[6].

53. Upon information and belief, other than the amount and name of the payee, the Refund Check was identical to all other checks which Mercy Housing, Inc. has issued to other individuals for the same or similar purpose. Other white individuals that received a check from Mercy Housing, Inc. for the same or similar purpose as the Refund Check were able to cash said checks at Wells Fargo without having to endure that which Ms. Middleton endured on December 19, 2018, at the 725-Brach, including but not limited to, the weaponization of 911, unwarranted police involvement, harassment, interruption, deterrence, false accusations of fraud, and, racial discrimination.

54. All conditions precedent to the commencement of this action have occurred and/or have been waived.

**Banking While Black at Wells Fargo**

55. It is no secret that Wells Fargo has high turnover and very poor training practices and procedures as is abundantly clear in online searches. Further, due to the high turnover rate of Wells Fargo employees—even reaching "41% in one 12-month period"—and many other reasons, new employees are not properly trained on how to deal with customers different than they are and are not provided adequate diversity training.

56. The Refund Check was not fraudulent and there was no reasonable basis to expect otherwise. Nothing that Ms. Middleton said or did on December 19, 2018, at the 725-Branch, *in any way*, created or raised suspicions of fraud. Even further, there was nothing on the face of the Refund Check would have, *in any way*, created or raised an erroneous suspicion of the Refund Check was fraudulent. To the extent that Ms. Middleton is guilty of something – it is that Ms.

---

[6] https://www.mercyhousing.org/

10 | Page

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Middleton is guilty of being black and expecting to enjoy the same contractual privileges as those that are white.

57. Wells Fargo's conduct towards Ms. Middleton is not unique or uncommon. Wells Fargo is all too familiar with claims of discrimination, and it appears that Wells Fargo's disregard for racial equality is a systemic problem reaching the highest levels of the organization.

58. According to the Atlanta Journal-Constitution, in 2016, Sam Benson went to withdraw funds at a nearby Wells Fargo branch. Like with Ms. Middleton, Mr. Benson also went to a Wells Fargo in an upscale section of Atlanta called Buckhead. Like with Ms. Middleton, Wells Fargo called the police on Mr. Benson accusing him of fraud, an accusation which, ultimately, was found to be meritless and unwarranted. Like with Ms. Middleton, Mr. Benson is also black.

59. According to the lawsuit filed by Jean Romanie Elie, on June 1, 2017, Mr. Elie went to a Wells Fargo branch located in Palm Beach County, Florida, to draw cash from a prepaid credit card honored by Wells Fargo. Like Ms. Middleton, Mr. Elie is of African descent. Without warning or reason, the Wells Fargo teller called the Palm Beach Sherriff's Office. Upon information and belief, there was no legitimate non-discriminatory reason for Wells Fargo to have called the police on Mr. Elie, who filed a lawsuit in the Palm Beach Circuit Court (Case No. 2018-CA-002116). It appears the case settled shortly after the court denied Wells Fargo's motion to dismiss Mr. Elie's amended complaint. Ms. Middleton and Mr. Elie share the same skin color.

60. On April 19, 2019, an African American man ("B.W.") entered a Wells Fargo branch in Tampa, Florida to conduct business. After unsuccessfully dealing with a couple of tellers, Mr. Watson was referred to the Branch Manager, who then used the N-word when speaking with B.W. The Wells Fargo branch manager confirmed that he said "Niggers." His explanation for this was that it was a "Freudian slip." Indeed, Wells Fargo sent a letter of apology dated June 4, 2019,

11 | Page

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

calling the use of the word "niggers" a "mistake" and that "it seems the utterance of the offensive term was unintentional." It remains entirely unclear how the use of that word could be unintentional. However, it appears that things work differently at Wells Fargo when it comes to race relations. Ms. Middleton and B.W. share the same skin color.

61.     According to her lawsuit, Patrina Harrison, an African American woman entered a Wells Fargo branch in San Francisco, California to conduct business on June 18, 2018. The branch manager asked Plaintiff Harrison what she was doing in the bank and then told her to "get out, you're black!"

62.     The above are just a few examples of similarly situated individuals that have come to the attention of the undersigned. Each of the above-referenced individuals are black, each was accused of fraud, and each accusation of fraud was false and unfounded. Each had law enforcement summoned by Wells Fargo. Each was racially profiled.[7]

63.     Moving away from the individual context, according to a July 12, 2012, Press Release form the United States Department of Justice, the Justice Department "filed the second largest fair lending settlement in the department's history to resolve allegations that Wells Fargo Bank, the largest residential home mortgage originator in the United States, engaged in a pattern or practice of discrimination against qualified African-American and Hispanic borrowers in its mortgage lending from 2004 through 2009."[8]

64.     The settlement was for $184.3 million in compensation and $50 million in direct down payment assistance.

---

[7] It must be noted that the above-referenced individuals represent only some of the individuals that contacted the undersigned or were found after a cursory internet search.

[8] *See* https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

65. The complaint filed in the District of Columbia, bearing Case No. 12-cv-01150, alleges, in relevant part, the following:

> African-American and Hispanic wholesale borrowers paid more than non-Hispanic white wholesale borrowers, not based on borrower risk, but because of their race or national origin. Wells Fargo's business practice allowed its loan officers and mortgage brokers to vary a loan's interest rate and other fees from the price it set based on the borrower's objective credit-related factors . This subjective and unguided pricing discretion resulted in African-American and Hispanic borrowers paying more. Wells Fargo was aware the fees and interest rates it was charging discriminated against African-American and Hispanic borrowers, but the actions it took were insufficient and ineffective in stopping it.
>
> As a result of Wells Fargo's policies and practices, qualified African-American and Hispanic wholesale borrowers were placed in subprime loans rather than prime loans even when similarly-qualified non-Hispanic white borrowers were placed in prime loans. The discriminatory placement of wholesale borrowers in subprime loans, also known as "steering," occurred because it was the bank's business practice to allow mortgage brokers and employees to place a loan applicant in a subprime loan even when the applicant qualified for a prime loan.

*See United States v. Wells Fargo Bank, NA*, No. 1: 12-cv-01150-JDB (D.D.C. Sept. 21, 2012).

66. Cities began suing Wells Fargo for its discriminatory lending practices, including Los Angeles, Oakland, Baltimore, Memphis, Miami, Cook County, Illinois, and Philadelphia.

67. The case filed by the City of Miami even made it to the United States Supreme Court which held that the City was "an aggrieved person" authorized to bring suit under the FHA. *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296 (2017). The City of Miami "claim[ed] that two banks, Bank of America and Wells Fargo, intentionally issued riskier mortgages on less favorable terms to African–American and Latino customers than they issued to similarly situated white, non-Latino customers. *Id.* at 1300–01.

13 | P a g e

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

68. On May 15, 2017, The City of Philadelphia filed a complaint in the Eastern District of Pennsylvania, bearing Case No. 17-cv-02203. The complaint alleged that Wells Fargo engaged in a "practice of issuing exploitative loan products" to minorities "as compared to the mortgage loans issued to similarly situated white borrowers."

69. In 2017, a federal judge granted final approval to a $35.5 million class action settlement resolving claims of racial discrimination at Wells Fargo. Wells Fargo Advisors LLC was sued in the U.S. District Court for the Northern District of Illinois, bearing Case No. 13-cv-06368. The plaintiffs accused Wells Fargo Advisors LLC of maintaining employment policies that systemically and intentionally excluded African-American financial advisors from the company's best-paying work opportunities and that these policies effectively segregated Wells Fargo's employees, and disparately impacted African-American advisors. In addition to the monetary payments, Wells Fargo will implement policy changes designed to prevent racial discrimination within the company.[9]

70. A Los Angeles jury deliberated nearly 4 weeks before determining that Wells Fargo discriminated against borrowers based on race.[10]

71. In September 2017, a class action complaint was filed in the U.S. District Court for the Eastern District of Pennsylvania, bearing Case No. 17-cv-04119. The case alleges Wells Fargo engages in a "a company-wide pattern and practice of employment discrimination, both intentional and systemic, on the basis of race…."

72. Rochelle Sims filed a similar case against Wells Fargo in the Southern District of

---

[9] *See* https://topclassactions.com/lawsuit-settlements/lawsuit-news/661027-wells-fargo-will-pay-35m-settle-race-discrimination-class-action/ (last visited March 15, 2019).
[10] *See* http://blog.cvn.com/2011/03/24/3-5m-verdict-in-wells-fargo-discriminatory-lending-action (last visited March 15, 2019).

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Texas, bearing Case No. 16-cv-3212. On February 7, 2018, The Honorable Fray Miller denied Wells Fargo's motion for summary judgment.

73. The list of cases in which Wells Fargo has been accused of racial discrimination goes on and on, and the above is just a representative sampling of such allegations.

74. Of course, this is all besides the myriad other wrongdoings for which Wells Fargo has been fined. For example, in April of 2018, Wells Fargo was fined one-billion dollars ($1,000,000,000.00) by the Consumer Financial Protection Bureau and the Office of the Comptroller of the Currency for forcing customers into car insurance and charging mortgage-borrowers unfair fees.

75. In February of 2018, the Federal Reserve "handed down unprecedented punishment late Friday for what it called the bank's "widespread consumer abuses," including its notorious creation of millions of fake customer accounts. Wells Fargo won't be allowed to get any bigger than it was at the end of last year -- $2 trillion in assets -- until the Fed is satisfied that it has cleaned up its act."[11]

76. In May of 2018, U.S. District Judge Vince Chhabria of California's Northern District Court agreed to give final approval on a $142 million class-action settlement in response to Wells Fargo & Company's fake accounts scandal.

77. In December 2018, Illinois Attorney General Lisa Madigan announced that Wells Fargo had agreed to pay approximately $17.3 million to resolve an investigation into Wells Fargo's misconduct in the marketing and sale of risky residential mortgage-backed securities (RMBS)

---

[11] *See* https://money.cnn.com/2018/02/02/news/companies/wells-fargo-federal-reserve/index.html?iid=EL.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

leading up to the 2008 economic collapse.[12]

78. On December 20, 2018, the Honorable Jon S. Tigar of the Northern District of California, in Case No. 3:16-cv-05479-JST, approved a class action settlement wherein Wells Fargo & Company are to pay $480 million to shareholders who said they were harmed by the bank's false statements about its misdeeds.

79. Wells Fargo & Company and certain officers and directors of Wells Fargo, including its CEO, were alleged to have violated federal securities laws and made misrepresentations and omissions about Wells Fargo's "cross-selling" business model.

80. In December 2018, a report authored by the Consumer Financial Protection Bureau[13] was released showing that Wells Fargo charges students the most in fees on average to have a bank account—nearly double the second and third ranked banks. Even though Wells Fargo held less than one-quarter of the total college-endorsed accounts, their account holders paid roughly half of the fees, according to data from the report.

81. On December 28, 2018, Wells Fargo & Company, acting for Wells Fargo Bank, N.A. entered into a settlement agreement with the Attorneys General of the 50 states and District of Columbia[14]. The agreement was for $575m and resolved claims that Wells Fargo violated consumer protection laws in all states and the District of Columbia. "Wells Fargo's conduct was unlawful and disgraceful," California's attorney general, Xavier Becerra, said in a news release on December 28, 2018. California will get almost $149 million under the settlement.

82. On January 2, 2019, California Insurance Commissioner Dave Jones accepted a

---

[12] *See* https://www.mpamag.com/news/wells-fargo-to-pay-17-3m-settlement-for-risky-rmbs-118300.aspx (last visited March 15, 2019).

[13] *See* https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/bcfp_foia_letter-to-department-education_record_2018-02.pdf (last visited March 25, 2019).

[14] A copy of the settlement agreement can be found at https://bit.ly/2EOJtet.

settlement from Wells Fargo wherein Wells Fargo agreed to pay California $5 million to settle allegations that it committed insurance fraud. Wells Fargo agreed to give up its insurance licenses for two years and to pay another $5 million if it ever wants to sell insurance in California again.[15]

83. In November 2019, Wells Fargo and an insurance company it worked with agreed to pay $432 million to settle a class-action lawsuit brought by customers who say they were charged premiums for auto insurance they did not need, in federal court in California[16].

## COUNT I
### *Violation of § 1981*

84. Ms. Middleton repeats, realleges and incorporates paragraphs 1 through 83.

85. As described above, Wells Fargo's outrageous conduct constituted discrimination because of Ms. Middleton's race in violation of Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, *et seq.*

86. Through Wells Fargo's discriminatory conduct, Wells Fargo deprived Ms. Middleton of her right to make and enforce contracts on the same terms as enjoyed by white persons, in violation of 42 U.S.C. § 1981.

87. In addition, Wells Fargo is liable for its employees' actions under the doctrine of *respondeat superior.*

88. Ms. Middleton is an African-American woman. Wells Fargo denied Ms. Middleton the opportunity to cash the Refund Check like any white patron because she is African-American. Ms. Middleton's race was the motivating factor behind Wells Fargo discrimination against Ms. Middleton. By virtue of Wells Fargo's actions and inactions, as set forth above, Wells Fargo has

---

[15] *See* https://www.ocregister.com/2019/01/03/wells-fargo-pays-fine-drops-insurance-license-in-california/.

[16] https://www.charlotteobserver.com/news/business/banking/article237666879.html.

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

violated § 1981.

89. Wells Fargo's conduct in discriminating against Ms. Middleton due to her race was intentional. Wells Fargo engaged in a discriminatory practice with malice, or with reckless indifference to, the federally protected rights of Ms. Middleton.

90. As a direct and proximate result of Wells Fargo's actions, Ms. Middleton has suffered, including but not limited to, personal humiliation, loss of capacity for the enjoyment of life, mental anguish, and embarrassment, of which justifies an award of compensatory damages and punitive damages, according to proof, against Wells Fargo.

91. As a result of the deprivations of rights at the hands of Wells Fargo, Ms. Middleton has retained Rodal Law, P.A, to which Ms. Middleton has agreed to pay a reasonable fee, which she is entitled to recover pursuant to 42 U.S.C. § 1988(b) and otherwise by law.

92. Plaintiff CLARICE M. MIDDLETON, respectfully, demands judgment against WELLS FARGO BANK, N.A., for damages, including punitive damages, attorney's fees and costs under 42 U.S.C. § 1988(b), and for any other relief this Court deems just and equitable.

### COUNT II
*Defamation*

93. Ms. Middleton repeats, realleges and incorporates paragraphs 1 through 83.

94. Wells Fargo, by and through its employees, explicitly, repeatedly, and above all else—wrongfully—accused Ms. Middleton of committing fraud.

95. The repeated allegations of fraud which Wells Fargo explicitly and loudly publicized to and about Ms. Middleton indicated that Ms. Middleton committed a crime.

96. Said explicit, repeated, and erroneous fraud accusations were heard by multiple third-parties, such as persons/patrons entering, inside, and leaving 725-Brach, as well as other Wells Fargo employees and members of law enforcement.

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

97.     Moreover, Mr. Clarke called 911 and informed the dispatcher that Ms. Middleton had "presented us a fraudulent check."

98.     The allegations of fraud that Wells Fargo purposefully directed at Ms. Middleton were false, defamatory, heard by others, was unabated, and had the natural tendency to injure Ms. Middleton. In particular, said claims challenged Ms. Middleton's integrity and credibility, led to a criminal investigation, and could have resulted in criminal prosecution.

99.     The erroneous and otherwise wrongful accusations of fraud made by Wells Fargo to and about Ms. Middleton were not made in good faith, but rather, made intentionally and maliciously with the intent to injure and harm Ms. Middleton. Such claims caused Ms. Middleton damages, including but not limited to, personal humiliation, loss of credibility, mental anguish, and embarrassment – of which have resulted in sleepless nights, irritability, tremors, nausea, vomiting, and physical pain.

100.    Plaintiff CLARICE M. MIDDLETON, respectfully, demands judgment against WELLS FARGO BANK, N.A., for damages, including punitive damages as set forth above and for such further relief as this Court deems proper. as this Court deems proper.

**DEMAND FOR JURY TRIAL**

Plaintiff CLARICE M. MIDDLETON, respectfully, demands a trial by jury of all issues so triable.

    /s/ M. Travis Foust
M. Travis Foust, Esq.
Georgia Bar No. 104996
tfoust@pcwlawfirm.com
PARKS, CHESIN & WALBERT, P.C.
75 Fourteenth Street, 26th Floor
Atlanta, GA 30309
(404) 873-8000 Telephone
(404) 873-8050 Facsimile

Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

20 | P a g e

Yechezkel Rodal, Esq.
Florida Bar No. 91210
E-mail:chezky@rodallaw.com
RODAL LAW, P.A.
5300 N.W. 33rd Ave., Suite 219
Fort Lauderdale, Florida 33309
Phone: (954) 367-5308
Fax:     (954) 900-1208

Pending admission *pro hac vice*

*COUNSEL FOR PLAINTIFF*

20 | P a g e

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com