## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CLARICE M. MIDDLETON,

    Plaintiff,

v.

WELLS FARGO BANK, N.A.,

    Defendant.

CASE NO. 1:19-cv-05435-CAP

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNT I AND STRIKE CERTAIN ALLEGATIONS IN PLAINTIFF'S COMPLAINT

Plaintiff, Clarice Middleton, responds to Defendant Wells Fargo Bank N.A.'s Motion to Dismiss Count I and Strike Certain Allegations in Plaintiff's Complaint [D.E. 10; 10-1], and states:

## INTRODUCTION

Rosa Parks—had she just stood up—would have made it to her destination along with the white person who took her seat. Rosa Parks was not "prevented[1]" or "thwarted[2]" from riding the bus that day in Montgomery, Alabama. As Wells Fargo would tell the tale—Ms. Parks would merely have had to stand while all the white

---

[1] A term used repeatedly throughout Wells Fargo's Motion to Dismiss.
[2] *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003).

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

folk were given seats. Wells Fargo's very narrow reading of *Lopez*[3] leads to the untenable and indefensible conclusion that Rosa Parks would have had no claim under § 1981. Wells Fargo's brief is as ringing endorsement of "separate but equal"—a doctrine long ago condemned by the United States Supreme Court. Ms. Middleton is not seeking to disregard or ignore *Lopez,* which is binding on this Court and at first glance may seem dispositive of Ms. Middleton's claims. Rather, Ms. Middleton asserts that *Lopez* is not a bright-line rule and that Wells Fargo is reading too much into dicta.

What if Ms. Middleton was made to stand in a "colored only" line to cash her check? What if Wells Fargo made African Americans provide five forms of identification and provide three separate character witnesses that must appear in person before Wells Fargo would cash their check? What if Wells Fargo only allowed African Americans to cash paychecks if the FBI verified every transaction? According to Wells Fargo, it would have zero liability under § 1981, so long as the checks were ultimately cashed. This is the position Wells Fargo urges this Court to take—a position that is simply irreconcilable with the language and history of § 1981 and a position that would erase decades of progress in civil rights protection and be a stinging blow to minorities throughout this great land.

---

[3] *Lopez v. Target Corp.*, 676 F.3d 1230 (11th Cir. 2012).

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

## BACKGROUND[4]

Ms. Middleton is a young, African American woman. ¶9. On December 18, 2018, Ms. Middleton went to the Wells Fargo branch located at 725 Houston Mill Road Northeast, Atlanta, Georgia 30329 to cash a $200.00 security deposit refund check ("Refund Check") from Mercy Housing, Inc., that was drawn on a Wells Fargo account. ¶¶ 23, 24, 25. This bank is in a predominantly white area. ¶¶ 27, 28. Ms. Middleton gave two forms of identification to the teller and placed her thumbprint on the check. ¶¶ 34, 35.  Ms. Middleton's thumbprint is clearly seen on the copy of the check in ¶¶ 24, 34. The teller took the check to a computer terminal and started to feverously type while watching Ms. Middleton with repugnance. ¶ 38. Ms. Middleton asked if everything was okay, and the teller responded, in within an earshot of other (white) patrons, she was checking to see if Ms. Middleton—*i.e.* the black woman in the bank—was attempting to cash a fraudulent check. *Id.*

Following this comment, the teller continued her investigation into the authenticity of the Refund Check. ¶ 40. Soon though, the teller walked away from the counter. Ms. Middleton asked the teller where she was going with the Refund Check and her identification, but the teller ignored her question. *Id.* Even more time passed. ¶41. A service manager, Damian Mahoney, then confronted Ms. Middleton, looked her up and down, and exclaimed the Refund Check to be fraudulent. *Id.* Ms.

---

[4] All paragraph references in this section are to the Complaint, D.E. 1.

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Middleton was counting on that money to pay bills. ¶ 29. There, humiliated in the presence of patrons and onlookers, Ms. Middleton asked Mr. Mahoney to reconsider, offering him some paperwork associated with the Refund Check to prove it was authentic, so he would cash her check. ¶ 41.

At this point, Blake Clark, the branch manager, confronted Ms. Middleton and instructed Mr. Mahoney to call the police. ¶ 43. Ms. Middleton now feared for her safety because, depending on how law enforcement perceived the situation, things could escalate quickly. *Id*. Mr. Clarke called 911, informed the dispatcher that Ms. Middleton had "presented us a fraudulent check," and asked her to leave. ¶¶ 44-45. Ms. Middleton calmly left the bank and waited for the police outside, after having been denied her right to cash her check. *Id*. Officer L. Anderson appeared on the scene, and after an interrogation of Ms. Middleton and investigation, it was revealed that the Refund Check was, in fact, not fraudulent. ¶ 46.

Wells Fargo did eventually cash Ms. Middleton's check. ¶ 46. However, what should have been a simple transaction, instead, resulted in Wells Forgo questioning Ms. Middleton's moral integrity, accusations of fraud, an aggressive and unwarranted interrogation like a common criminal, and Ms. Middleton suffering deep embarrassment and humiliation. *Id*. Ms. Middleton also alleged that other white individuals that received a check from Mercy Housing, Inc. for the same or similar purpose as the Refund Check were able to cash said checks at Wells Fargo without

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

having to endure that which Ms. Middleton endured. ¶ 53.

Plaintiff filed her Complaint on December 12, 2019 [D.E. 1]. Wells Fargo moved to dismiss the case [D.E. 10, 10-1] and argues certain allegations should be stricken from Plaintiff's complaint. As to Plaintiff's §1981 claim, Wells Fargo only makes one argument—Plaintiff's claim is barred by *Lopez v. Target Corp.*, 676 F.3d 1230 (11th Cir. 2012). Wells Fargo contends that the mere fact that Plaintiff was ultimately able to cash her check is enough to disqualify her claim under §1981. In other words, Wells Fargo asserts that *Lopez* presents a bright-line rule: so long as the contract is consummated—there can be no claim under § 1981, no matter what happened during the making and enforcing of the contract. To use Wells Fargo's language, so long as "*she completed her transaction*," her claim fails. [D.E. 10-1 at 5] (emphasis in original).

## **MEMORANDUM OF LAW**

### I.    **Ms. Middleton Stated a Claim Under §1981**

#### **a.  Standard of review**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all of the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). The Supreme Court has explained that a claim for relief must contain sufficient factual allegations to cross "the line between possibility and

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

plausibility." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007). "Related to this is the rule that a district court has the inherent power to dismiss an action that is "so patently lacking in merit as to be frivolous. Frivolity is distinct from mere improbability. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable [.]" *Twombly,* 550 U.S. at 556. However, improbability tips into frivolity where the "allegations ... are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel." *Ashcroft v. Iqbal,* 556 U.S. 662, 696 (2009) (Souter, J., dissenting); *Guthrie v. U.S. Gov't*, 618 Fed. Appx. 612, 617 (11th Cir. 2015).

### b. Wells Fargo's interpretation of §1981 is repugnant and all §1981 claims should be reviewed on a case-by case basis.

The elements of a cause of action under § 1981 are: "(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute." *Kinnon v. Arcoub, Gopman & Assocs., Inc.,* 490 F.3d 886, 891 (11th Cir. 2007). Only the third prong is at issue at this stage.

From the outset, Plaintiff acknowledges that *Lopez* may be seen as troubling for her case. However, reading *Lopez* as narrowly as Wells Fargo urges would lead to the absurd conclusion that Rosa Parks, Ms. Middleton, and an African American

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

customer made to stand in a "colored only" line[5] would all be foreclosed from raising a claim under § 1981. And what about Mr. Homer A. Plessy[6]? What then, would their legal remedy be? Where is the promise made to them with the civil rights acts?

Case law has consequences and Ms. Middleton challenges Wells Fargo to dispute in its Reply that a black customer that was made to wait in a "colored only" line or subjected to extremely discriminatory practices but was ultimately permitted to cash her check—would be barred under § 1981, according to Wells Fargo.

Certainly, not every discriminatory action will lead to a cause of action under § 1981 and "Section 1981 does not provide a general cause of action for all racial harassment that occurs during the contracting process." *Kinnon*, 490 F.3d at 892. But where is that line? *Lopez* certainly presents a conundrum: how does the court reconcile discrimination with § 1981 cases in the retail context?  Wells Fargo's argument is that a completed transaction controls, regardless of how racist, delayed, degrading, dehumanizing, or traumatizing a plaintiff's experience may be. This solution is unconscionable, signals a dangerous message, and is in direct contradiction to the stated purpose of § 1981.  Ms. Middleton's claim and all §1981 claims should be analyzed on a case-by-case basis.

---

[5] Of course, Ms. Middleton is merely making a point and is not in any insinuating that Wells Fargo has encouraged a "colored only" line.

[6] *Plessy v. Ferguson*, 163 U.S. 537 (1896), was a landmark decision of the U.S. Supreme Court that upheld the constitutionality of racial segregation laws for public facilities as long as the segregated facilities were equal in quality – a doctrine that came to be known as "separate but equal". *Plessy* was rejected over 50 years later in *Brown v. Bd. of Ed. of Topeka, Shawnee County, Kan.*, 347 U.S. 483, 489 (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955).

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

### i. Congress intended all stages of a contractual relationship to be subject under 42 U.S.C. § 1981

§ 1981 is about the contractual relationship—not just about the actual contract formation or rejection of a contract. Indeed, the word "relationship" was deliberately placed into the statute during the 1991 amendments and included in the legislative intent. § 1981(b) simply cannot be reconciled with Wells Fargo's position. Wells Fargo seeks to limit the scope of § 1981, arguing that overt, discriminatory obstacles to contract enforcement are categorically unenforceable when a plaintiff can show contract performance at the end of the day. In other words, Wells Fargo argues it is irrelevant that Ms. Middleton was demeaned, traumatized, humiliated, and stripped of her dignity all because of the color of her skin—since she was able cash her check once the police got involved.

"[W]e begins with the principle that congressional intent is the keystone of federal rights creation. *Yarbrough v. Decatur Hous. Auth.,* 931 F.3d 1322, 1325 (11th Cir. 2019) (*citing Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002).) A plain reading of §1981 clearly shows Wells Fargo's position is the opposite of Congress' intent. Such an interpretation does not flow logically from the statutory language. When the statutory language is plain, courts must enforce it according to its terms. *See*, *e.g., Dodd v. United States,* 545 U.S. 353, 359 (2005). Statutory interpretation always begins with the plain language of the statute. *Lamie v. United States Trustee,* 540 U.S. 526, 534 (2004).

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

42 U.S.C. § 1981[7] is the present codification of this great nation's oldest civil rights statute, the Civil Rights Act of 1866. It guarantees to every person "the same right … to make and enforce contracts … as is enjoyed by white citizens." The very next section defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The plain language makes clear that § 1981 guarantees to every person the right to be free from racial discrimination in their actual or *prospective contractual relationships. Id*. (emphasis added).

In 1991, § 1981 was amended to unwind the United States Supreme Court's decision in *Patterson v. McLean Credit Union,* 491 U.S. 164 (1989). *Patterson* "narrowed § 1981 by excluding from its scope conduct occurring after formation of the employment contract, where retaliation would most likely be found." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008). Ms. Patterson alleged that she suffered harassment, was not promoted, and was ultimately terminated from her job because

---

[7] The language of § 1981 originated in § 1 of the Civil Rights Act of 1866, which was enacted shortly after the ratification of the 13th Amendment. *Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 384 (1982). The same Congress also passed the Joint Resolution that was later adopted as the Fourteenth Amendment. *Id.* "The principal object of the [1866 Act] was to eradicate the Black Codes, laws enacted by Southern legislatures imposing a range of civil disabilities on freedmen." *Id.* Several decades ago, the Supreme Court recognized that § 1981 applies to private discrimination as well as to state action. *See e.g. Johnson v. Railway Exp. Agency, Inc.,* 421 U.S. 454, 460 (1975). "An individual who establishes a cause of action under s 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages." *Id.*

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

of her race. *Patterson* "significantly limited the scope of § 1981. The Court focused upon § 1981's words "to make and enforce contracts" and interpreted the phrase narrowly." *Id*. at 449. "Congress passed the Civil Rights Act of 1991, with the design to supersede *Patterson*." *Id.*

Congress expanded the scope of "make and enforce" by adding the current § 1981(b) definition. The right to "make and enforce contracts" free from racial discrimination now "includes the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." *Id*., at 450. This language was included in § 1981 to protect victims of intentional discrimination following a strong congressional reaction against *Patterson*. *See* H.R. REP. 102-40, 92, 1991 U.S.C.C.A.N. 549, 630. Congress rejected *Patterson* because of its devastating effects on discrimination victims who "often have nowhere else to turn to redress the indignities they have suffered." *Id.,* at 629.

Although Patterson dealt with employment discrimination cases, Congress acknowledged §1981(b) should prevent discrimination in private contracts stating it "intend[ed] this provision to bar all race discrimination in *contractual relations*. The list set forth in subsection (b) is intended to be illustrative rather than exhaustive." *Id*., at 630 (emphasis added). §1981(b) was not reconstructed with the intention of limiting liability for blatant acts of discrimination in making and enforcing contacts. *Id*. The legislature did not envision an exit door for purveyors of racism, but for

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

courts to have a broader view on how racial discrimination impairs contractual relationships. Again, with the contractual relationship language. Wells Fargo is again challenged in its reply to explain what the words 'contractual relationship' refer to in § 1981(b).

If there was any doubt as to Congress' intent—it was clarified by a list of examples, a list that is extremely damaging to Wells Fargo's position. "In the context of employment discrimination, for example, this would include, but not be limited to, claims of harassment, discharge, demotion, promotion, transfer, retaliation, and hiring." H.R. REP. 102-40, 92, 1991 U.S.C.C.A.N. 549, 630. The fact the Congress specified harassment, transfer, and demotion in addition to discharge, means that all are covered by § 1981. Now, if an employee was harassed or transferred—but not discharged, the employee's contract is still being honored, and according to Wells Fargo, that is a categorical bar to the employee's claims under § 1981. Wells Fargo's position was expressly and unequivocally quashed by the 1991 amendments.

With these principles, we now can reconcile some of the language in *Lopez*[8].

### ii.  *Lopez v. Target Corporation* is not a bright-line rule

Ms. Middleton concedes that the issue raised in *Lopez* is the most controversial part of her case, and the only issue needed to be independently

---

[8] Specifically, whether "Winn's refusal to serve Lopez sufficiently thwarted [Lopez'] § 1981 right to contract, notwithstanding the fact that Lopez was ultimately able to purchase the items he wanted at the prices quoted by the store". *Lopez*, 676 F.3d 1230 at 1233.

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

addressed by this Court at this stage. This is a unique case. The facts here are unlike any other § 1981 case in any other circuit to address this issue.

### 1. *Lopez v. Target Corporation*

The facts in *Lopez* are straightforward and easily distinguishable. Mr. Lopez was able to simply go over to the next cashier and complete his purchase. Mr. Lopez went to an Orlando Target store to purchase a few items and waited in line. *Lopez v. Target Corp.,* 676 F.3d 1230, 1231 (11th Cir. 2012). Once Mr. Lopez got to the front of the line, Ms. Winn, the cashier, told Mr. Lopez that the register was closed. *Id.* When Lopez hesitated to leave the line, Winn "again told him in a very rude tone of voice that her register was closed." *Id.* Lopez left the register, and Winn proceeded to serve the next customer in line. *Id.* As Lopez walked away, Winn "was laughing and gesturing toward Mr. Lopez to the customers standing in line." *Id.* There were no other Hispanic customers in Winn's line." *Id.* A supervisor then told Mr. Lopez that Ms. Winn would accept his money and that he should return to her line. *Id.* However, when Mr. Lopez again reached the front of the line, Ms. Winn "said in a very loud voice, 'Don't you listen? I'm closed!'" *Id., at 1232.* Mr. Lopez went to a different register and completed his purchase. *Id.*  The district court dismissed the § 1981 claim "because Lopez was ultimately able to purchase his items and thus Winn did not '*actually* thwart [Lopez's] ability to enter into a contract' with Target." *Id.*

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

## 2. *Lopez* is distinguishable

Critically, Ms. Middleton was actually removed from the Wells Fargo branch. *Compl.*, ¶ 45. Her request to have her check cashed was completely, categorically, and unambiguously denied by the teller and branch manager and Ms. Middleton was forced to leave the Wells Fargo premises. Perhaps cognizant of this point, Wells Fargo seeks to stretch *Lopez* so far as to assert as its basis for dismissal that "Plaintiff has acknowledged that Wells Fargo cashed her check *on the day* of the incident described in her Complaint." D.E. 10-1 at 5 (emphasis added.) *Lopez* is not explicit on this point, but it seems that the discrimination Mr. Lopez suffered spanned a few minutes and only one employee. Now, Wells Fargo asserts that *Lopez* covers any transaction consummated on the same day as the discrimination. What if Ms. Middleton had been detained, harassed, and discriminated against by Wells Fargo for 5 hours? 12 hours? 23 hours? In the line now 24 hours, as Wells Fargo asserts?

Again, Ms. Middleton was, in fact, denied an opportunity to make and enforce a contract under which she had rights. Ms. Middleton's request to cash her paycheck was completely refused. *Compl.* at ¶ 41-43. As emphasized in the Complaint, the reason given for refusing to cash the paycheck—a lie; the bank managers falsely stated that the paycheck was fraudulent. *Compl.* at ¶ 41 ("[Mr. Mahoney] exclaimed the Refund Check to be fraudulent" and).

Unlike Mr. Lopez, Ms. Middleton could not have simply gone to another

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

teller, because Wells Fargo, as a whole, refused Ms. Middleton's attempt to make and enforce a contract. This reality is confirmed by Ms. Middleton's *second* attempt to cash the paycheck, that is, offering proof her check was valid[9]. *Compl*. at ¶ 43.

Ms. Middleton's first *and* second attempt to cash her paycheck—to make and enforce a contract—were both completely denied. As the First Circuit of Appeals noted, "shopping in a retail store may involve multiple contracts. Each time a customer takes an item off the shelf, a new contract looms, and each time the item is returned, the potential contract is extinguished." *Garrett v. Tandy Corp.*, 295 F.3d 94, 100 (1st Cir. 2002). Here, when Wells Fargo first refused to cash Ms. Middleton's check, § 1981 was violated. In *Lopez,* the cashier did not assert that Mr. Lopez could not purchase his items—she stated he could not do so at her register. *Lopez*, at 1231.

*Lopez* does not foreclose Ms. Middleton's § 1981 claim. After being accused of fraud by the Wells Fargo service manager *and* then the branch manager, being treated like a common criminal, having to plead to bank managers to cash her check in the presence of onlookers, having Wells Fargo call the police on her,[10] being

---

[9] "Ms. Middleton offered to provide Wells Fargo which the paperwork associated with the Refund Check which she had in her pocket—to *prove* it was authentic and not otherwise fraudulent—but Ms. Middleton's attempts were in vain." *Compl*. at ¶ 41.

[10] This fact must be taken in the social and environmental context at the time considering the growing problem of law enforcement violence against African American citizens and the growing problem of businesses summoning the police of African American citizens without just cause. *See e.g. https://www.cnn.com/2018/12/20/us/living-while-black-police-calls-trnd/index.html* (last visited February 7, 2020).

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

detained, being interrogated by law enforcement, and with the threat of real prison time. Yes, notwithstanding the prior denials, Ms. Middleton was finally able to cash her paycheck once an officer instructed Wells Fargo that it had no basis to deny the transaction. Drawing all inferences in favor of Ms. Middleton, this is a case not contemplated or covered by *Lopez*.

Critically, the cashier in *Lopez* did not assert that Mr. Lopez could not purchase his items—she stated he could not do so at her register. In fact, "[t]he supervisor "apologized profusely" to Lopez and gave him store coupons totaling $9." *Lopez*, at 1232. Essentially, Mr. Lopez was mistreated and discriminated against, but ultimately, he was able to complete his transaction with the cashier at the next open checkout. In other words, it was only one cashier that refused service and not Target as a store. Here, Ms. Middleton could not just go to another teller and again attempt to cash her check. Wells Fargo as a whole, from teller to branch manager—refused to honor her contract. A third party—law enforcement—had to get involved. Ms. Middleton was completely refused by Wells Fargo.

The *Lopez* Court highlighted this point by stressing that "Lopez was not attempting to contract with [the cashier] directly. Plainly, he was attempting to contract with Target, and he was successful in that endeavor." *Id.* Similarly, in *Arguello,* cited to by the *Lopez* court, "Arguello's transaction was completed by the *same* clerk who initially refused to serve her on equal terms as other customers." *Id.*

(analyzing *Arguello v. Conoco, Inc.*, 330 F.3d 355 (5th Cir. 2003)). For starters, Wells Fargo held on to Ms. Middleton's check and two forms of identification and refused to cash the check for her. *Compl.*, ¶ 39. *Moreover, the service manager and branch manager were also involved*. *Compl.* ¶¶ 41, 43. Thus, it was Wells Fargo that was refusing to allow Ms. Middleton to "make or enforce" the contract, and not just an individual teller. Ms. Middleton could not then have gone to another teller and tried to cash her paycheck.

Essentially, Mr. Lopez was up against one employee, but as far as we can tell, all of the other employees, including the store manager, were on Mr. Lopez's side. Not so here. Ms. Middleton was up against the entire branch. Ms. Middleton was up against Wells Fargo, with nowhere to turn. Unlike this case, the *Lopez* Court was "not faced [] with circumstances where a customer was refused service by the retail store, … or was in any other way denied the right to make, enforce, or terminate a contract. *Lopez*, at 1235.

Wells Fargo cites to *Kinnon* and asserts that the *Lopez* Court relied on *Kinnon* in reaching its ruling. *Kinnon v. Arcoub, Gopman & Associates, Inc.*, 490 F.3d 886 (11th Cir. 2007). However, *Kinnon* is inapposite as there, the contract had been self-terminated, and the discriminatory behavior occurred well after the contract was terminated. "Kinnon successfully entered into a verbal contract with Flora's for the delivery of pizza, and when the delivery was late, Kinnon successfully took steps to

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

terminate the contract and ate out of the office at a restaurant." *Id.*, at 892. The Eleventh Circuit Court of Appeals did not have to reach the issue facing this Court. "Moreover, [in *Kinnon*] the discriminatory conduct occurred *after* the contract at issue had been terminated…. As the district court correctly observed, the contract at issue here was terminated before Gopman began her campaign of discriminatory telephone calls. As such, those telephone calls constituted post-contractual activity, and cannot form the basis of a § 1981 claim by Kinnon." *Id.* at 892-3. (emphasis in original). Thus, the point of law Wells Fargo cites to was mere dicta.

Tellingly, in reaching its holding, the *Lopez* Court cited with approval the Seventh Circuit opinion in *Bagley* which "held that a plaintiff failed to state a § 1981 claim based on a salesperson's refusal to serve him, where a different sales clerk had offered to help the plaintiff complete his transaction; the court reasoned that this offer demonstrated that the store would have contracted with the plaintiff had he not abandoned his efforts to make a purchase." *Bagley v. Ameritech Corp.,* 220 F.3d 518, 521–22 (7th Cir. 2000). The *Lopez C*ourt noted that "[w]hile we do not fault [the plaintiff] for taking offense at [the salesperson's] conduct ... her actions cannot be construed as anything more than a refusal to *personally* wait on [the plaintiff]." 676 F.3d at 1235, n 4. (emphasis in original).

As stated above, the Civil Rights Act of 1991 specifically expanded the reach of § 1981, and was enacted, in part, to respond "to recent decisions of the Supreme

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Court by *expanding the scope of relevant civil rights statutes in order to provide adequate protection* to victims of discrimination," Pub. L. 102-66, 105 stat. 1071 § 3 (1991) (emphasis added). In the legislative history of the Act, Congress wrote:

> H.R. 1, the Civil Rights Act of 1991, has two primary purposes. The first is to respond to recent Supreme Court decisions by restoring the civil rights protections that were dramatically limited by those decisions. The second is to strengthen existing protections and remedies available under federal civil rights laws to provide more effective deterrence and adequate compensation for victims of discrimination. The Civil Rights Act of 1991, therefore, was a swift and complete interment of the holding in *Patterson v. McLean*.

H.R. Rep. No. 102-40(II), at 1 (1991), as reprinted in 1991 U.S.C.C.A.N. 549, 694.

> First, the language of the statute itself—particularly the detailed explanatory language of subsection (b)—is broad and inclusive….Moreover, the [Civil Rights Act of 1991] statement of purposes explicitly describes the Act as "*expanding* the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." Civil Rights Act of 1991 § 3(4) (emphasis added). Therefore, as a matter of statutory construction, the "make and enforce contracts" clause is to be interpreted broadly…. First, the language of the statute itself—particularly the detailed explanatory language of subsection (b)—is broad and inclusive… Third, civil rights legislation—such as § 1981, which is designed to address invidious racial discrimination—is generally interpreted broadly in keeping with its remedial purpose. It is written in general language with the understanding that courts have wide latitude in construing it to achieve the remedial purposes that Congress identifies… Failing to construe § 1981 liberally could remove certain racially discriminatory conduct—conduct that Congress intended to prohibit—from the purview of the statute.

*Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 857,858 (8th Cir. 2001)((Arnold, J., dissenting).

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

In the Senate debate leading up to passage of the 1991 Act, Senator Danforth, introducing the Interpretive Memorandum of the sponsors of the final version of the basic bill, remarked on § 4 of the bill, later renumbered as § 101:

> Section 4 fills the gap in the broad statutory protection against intentional racial and ethnic discrimination covered by section 1981 ... that was created by the Supreme Court's decision in *Patterson* .... Section 4 reinstates the prohibition of discrimination during the performance of the contract .... *The list set forth in subsection (b) is illustrative only, and should be given broad construction to allow a remedy for any act of intentional discrimination committed in the making or the performance of a contract ....*

137 Cong. Rec. S15483 (daily ed., Oct. 30, 1991) (emphasis added).

Congress repeated this sentiment elsewhere—that the list of discriminatory acts provided in new Section 1981(b) was "intended to be illustrative and not exhaustive," H.R. Rep. No. 102-40(II), at 37, and noted § 1981's applicability in "a broad variety of contexts." *Id.* at 90. Based upon the facts as alleged in the Complaint and the context in which they occurred, it is inconceivable that these actions were excluded by Congress. It is simply not possible to reconcile the strongly expressed intent of Congress found in the Civil Rights Act of 1991 with the limitations Wells Fargo urges the Court to impose. If Wells Fargo has its way, businesses would be free to treat racial minorities in any prejudicial or discriminate way they saw fit, and escape liability under § 1981, so long as the transaction was ultimately concluded.

Wells Fargo argues the means are irrelevant and the Court need only look at the ends. To take Wells Fargo's position to its logical conclusion, Wells Fargo could

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

theoretically have tellers for only white customers and tellers for African American customers who would be subjected to rigorous hurdles, harassment, and humiliation, and avoid liability under § 1981, so long as the black customers were allowed to complete the transaction. If Wells Fargo required African American customers to enter the store through the "colored entrances" that were often used in the South until the 1960s, or to use racially segregated restrooms, or to use racially segregated ATM machines, as long as the minorities would be permitted to transact, under Wells Fargo's reasoning, there would be no §1981 violation because the minorities were not actually denied the ability to contract. This is simply an absurd reading of the statute and exactly what Wells Fargo is asking this Court to do. It is axiomatic that "the doctrine of 'separate but equal' has no place." *Brown v. Bd. of Educ.*, 347 U.S. 483, 495, (1954).

Further, if an African American customer became offended at the thought of having to wait in a "colored only" line and then walked out of the bank, Well Fargo would simply argue that Wells Fargo "would have contracted with the plaintiff had he not abandoned his efforts to make a purchase." *Lopez*, 676 F.3d at 1235, fn4 (11th Cir. 2012). It is simply impossible to reconcile Wells Fargo's position with the plain language of § 1981 and legislative intent.

This is not to say that § 1981 doesn't have its limits. Clearly, it does. That said, Ms. Middleton urges the Court to heed the First Circuit's admonition that "such

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

situations call for careful line-drawing, case by case." *Garrett*, 295 F.3d at 101.[11]

> Of course, section 1981, like many laws, is more easily interpreted at the polar extremes. The statute applies, for example, if a store refuses, on race-based grounds, to permit a customer to purchase its wares. By the same token, it does not apply if no contractual relationship is ever contemplated by either party (say, if a store manager makes a racially insensitive comment to a fireman who responds to a false alarm). The harder cases occupy the middle ground: cases in which a contract was made and the alleged discrimination bears some relation to it. The case at bar falls into this "middle" category. Particularly after the passage of the 1991 amendment, such situations call for careful line-drawing, case by case.

*Garrett v. Tandy Corp.*, 295 F.3d 94, 101 (1st Cir. 2002)

The addition of § 1981(b) extended the statute's protections "to all phases and incidents of the contractual relationship," *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994). The Eighth Circuit Court of Appeals also held that "to prevail in their § 1981 case [plaintiffs] must also show actionable interference with their contractual interest." *Green v. Dillard's, Inc.*, 483 F.3d 533, 539 (8th Cir. 2007). However, because the statute should be applied on a case by case basis, the court allowed the § 1981 claim to proceed to trial.

> Here, there is evidence that McCrary explicitly refused service to the Greens when they first approached her, discouraged her coworker from assisting them by questioning their ability to pay, and treated them at all times with pronounced hostility while rejecting Rodney's request to leave them alone. No other employee

---

[11] The court ultimately denied Garrett's § 1981 claim because Garrett's "own complaint makes clear that he made these purchases without impedance and thenceforth enjoyed the use and ownership of the goods without interruption. The alleged harassment—the appearance of the police on his doorstep—did not occur until long after he had left the Radio Shack outlet." *Id.*

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

reproached her or tried to stop her behavior, and the manager requested by Rodney Green did not appear until after McCrary had left the section in a huff. Although other Dillard's employees were more civil to the Greens, a jury could reasonably find that McCrary's acts of refusing service, interfering with the attempts of another employee to help them, and culminating in a forceful racial insult were enough to thwart the Greens' ability to complete their purchase. McCrary did not merely refuse to serve the Greens personally; she actively hindered Aguero's service as well. *Cf. Bagley v. Ameritech Corp.,* 220 F.3d 518, 521 (7th Cir.2000) (manager personally hostile to black customer but facilitated service from another employee). We conclude there is a genuine issue of fact as to whether the Greens suffered actionable interference with their rights under § 1981.

*Green v. Dillard's, Inc.*, 483 F.3d 533, 539 (8th Cir. 2007)

Ms. Middleton submits that *Lopez* should be strictly limited to its facts—that it was an individual employee's discrimination—as *Lopez* is already a great limitation on §1981.

## II.   Plaintiff's Allegations Concerns Issues Central to this Lawsuit

Wells Fargo next seeks to strike paragraphs 57-83 of Plaintiff's Complaint. At the outset[12], Plaintiff concedes paragraphs 63-83 may be stricken. Plaintiff notes paragraphs 57-62 ("The Paragraphs") should be analyzed differently than

---

[12] It is important to note that Wells Fargo is free to move in limine to exclude any information it deems is irrelevant or important once the case develops. Reference to having settled prior similar suits does not have a prejudicial effect at the pleadings stage. *Blake v. Batmasian,* 318 F.R.D. 698, 702 (S.D. Fla. 2017). At this stage, Wells Fargo's motion is premature in part "because of the limited importance of pleadings in federal practice." *Bureerong v. Uvawas,* 922 F. Supp. 1450, 1458 (C.D. Cal. 1996). Moreover, Wells Fargo is certainly not foreclosed from raising these arguments in response to Plaintiffs' discovery, if such is forthcoming.

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

paragraphs 63-83, in that the former paragraphs describe examples where Wells Fargo engaged in strikingly similar behavior to the instant case—namely, refusing banking services to African Americans and reporting them to law enforcement under baseless allegations of fraud.

That said, Wells Fargo's Motion completely misses the mark set by Rule 12(f) in moving to strike The Paragraphs in the Complaint. Wells Fargo's history of discrimination is important to contextualize Wells Fargo's culture of racial prejudice against African Americans in particular.

Wells Fargo raised this same argument in another § 1981 case the undersigned litigated in California, involving substantially similar allegations as are now at issue.

> The Court finds that the allegations in paragraphs 40-59 are irrelevant and unfairly prejudicial, while the allegations in paragraphs 31-39 concerning five similar individual racial discrimination lawsuits against Wells Fargo are not. The individual racial discrimination claims each involve an African-American person entering a Wells Fargo branch to conduct a legitimate transaction, an unwarranted denial by Wells Fargo to complete the transaction, and Wells Fargo summoning law enforcement. Id. ¶¶ 34-38. The FAC alleges very similar circumstances; therefore, at the pleading stage, allegations concerning other similar individual claims against Wells Fargo support the inference that Wells Fargo has a policy and practice of discriminating in the manner alleged in the FAC. Considering that motions to strike are generally disfavored, the Court finds it inappropriate to strike these allegations from the FAC.

*Merritt v. Wells Fargo Bank, N.A.*, No. SACV 18-1960 JVS (JDEx), 2019 U.S. Dist. LEXIS 75484, at *25-26 (C.D. Cal. Mar. 15, 2019).

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Wells Fargo asserts The Paragraphs should be stricken because they "have no bearing on the lawsuit," but is incorrect. (DE 10-1 at 5). While Rule 12(f) authorizes courts to strike "any redundant, immaterial, impertinent, or scandalous matter," a motion to strike is considered "a drastic remedy" disfavored by the courts. *Island Shores Condo. Ass'n, Inc. v. Great Am. Ins. Co. of New York*, No. 1:14-CV-24490-UU, 2015 WL 12781320 (S.D. Fla. 2015); see also *Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla.*, 306 F.2d 862, 868 (5th Cir.1962).

### a. "Immaterial," "Irrelevant," and "Impertinent"

"Immaterial matter" is defined as having "no important relationship to the claim or defense." *Bledsaw v. Carnival Corp*., 2015 WL 9594296 (S.D. Fla. 2015) (internal citations omitted). Notably, allegations which may not be directly tied to the present claim but still show a defendant's "policy and practice" and "knowledge and intent" are relevant. *Campbell v. Feld Entm't Inc.,* 2014 WL 1366581, at *1 (N.D. Cal. 2014) (finding relevant allegations of the defendant's "policy and practice").

The allegations in The Paragraphs are not immaterial, irrelevant, or impertinent. Specifically, paragraphs 58-61 allege four separate instances in which individuals, like Ms. Middleton, were discriminated against by Wells Fargo[13].

---

[13] Each instance involves: (1) a black person; (2) entering a Wells Fargo branch; (3) to conduct a legitimate and non-fraudulent transaction; (4) an unwarranted denial by Wells Fargo to complete the transaction. *Id.*

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

*Compl.*, at ¶¶ 58-61. Because the subject paragraphs underscore Wells Fargo's culture of discrimination, *i.e.* why Wells Fargo employees treated Ms. Middleton like a criminal from the start—they "have some possible relation to the controversy" before this Court and must not be stricken from the Complaint as irrelevant.

### b. "Prejudice"

The Paragraphs are not *unduly* prejudicial. Even if "the offending matter literally is within one or more of the categories set forth in Rule 12(f)," the motion to strike should be denied "when the court believes that no prejudice could result from the challenged allegations." (Wright & Miller, Federal Practice & Procedure: Civil § 1382 at 443-44 (2004)); *See also Ammirati v. Bonati, M.D.*, 1994 WL 34175, (M.D. Fla. 1994) ("this court will not order allegations stricken from a complaint unless the presence of the allegations in the complaint clearly prejudice the defendant."). For these reasons, the Court should deny Wells Fargo's Motion to Strike as to The Paragraphs.

## <u>CONCLUSION</u>

Based upon the foregoing, Ms. Middleton respectfully requests this Court deny Wells Fargo's Motion to Dismiss Count I and Strike Certain Allegations in Plaintiff's Complaint.

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

## <u>CERTIFICATE OF FONT SIZE</u>

Pursuant to Local Rule 7.1D, Defendant's counsel certifies that this motion has been prepared in Times New Roman 14-point font, one of the fonts approved in Local Rule 5.1C.

Respectfully Submitted,

/s/ Yechezkel Rodal
Yechezkel Rodal, Esq.
Florida Bar No.  91210
E-mail:chezky@rodallaw.com
RODAL LAW, P.A.
5300 N.W. 33rd Ave., Suite 219
Fort Lauderdale, Florida 33309
Phone: (954) 367-5308
Fax:   (954) 900-1208

*/s/ M. Travis Foust*
M. Travis Foust, Esq.
Georgia Bar No. 104996
tfoust@pcwlawfirm.com
PARKS, CHESIN & WALBERT, P.C.
75 Fourteenth Street, 26th Floor
Atlanta, GA 30309
(404) 873-8000 Telephone
(404) 873-8050 Facsimile

*Counsel for Ms. Middleton*

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on  February 7, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send notice of such filing to the following attorney of record:

Frederick T. Smith
Georgia Bar No. 657575
SEYFARTH SHAW LLP
1075 Peachtree Street, NE, Suite 2500
Atlanta, GA 30309
fsmith@seyfarth.com

Rodal Law, P.A.
*Attorney for Ms. Middleton*
5300 N.W. 33rd Ave., Suite 219
Ft. Lauderdale, Florida 33309
Telephone: (954) 367-5308

*/s/Yechezkel Rodal*
Yechezkel Rodal, Esq.
Florida Bar No. 91210
chezky@rodallaw.com
*Admitted Pro Hac Vice*

**Rodal Law, P.A.**
5300 NW 33rd Ave., Ste. 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com