UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLARICE M. MIDDLETON,

    Plaintiff,

v.

WELLS FARGO BANK, N.A.,

    Defendant.

CIVIL ACTION NO.
1:19-CV-05435-CAP

## **O R D E R**

The plaintiff filed this action on December 2, 2019, asserting counts for violation 42 U.S.C. § 1981 and defamation [Doc. No. 1]. The defendant filed a partial motion to dismiss the § 1981 claim and to strike certain allegations in the plaintiff's complaint [Doc. No. 10]. Briefing is now complete, and that motion is now before the court.

## I.    The Defendant's Motion to Strike

The defendant moved to strike paragraphs 57-83 of the plaintiff's complaint. Mot. to Dismiss [Doc. No. 10-1] at 5–8. The plaintiff "concedes paragraphs 63-83 should be stricken," but opposes striking paragraphs 57-62. Resp. to Mot. to Dismiss [Doc. No. 13] at 22. The defendant replies, in turn, that it "does not oppose Plaintiff's position to retain Paragraph Nos. 57-62, even though it believes such allegations are irrelevant." Reply to Mot. to

Dismiss [Doc. No. 19] at 12. Accordingly, paragraphs 63 through 83 are hereby STRICKEN from the complaint.

## II.    Factual Allegations[1]

On December 18, 2018, Ms. Middleton received a check from Mercy Housing, Inc. in the amount of $200.00, representing the security deposit refund from an apartment she recently vacated. Complaint [Doc. No. 1] at ¶¶ 22, 23.The check was drawn on a Wells Fargo account and was made payable directly to Ms. Middleton. *Id.* All information contained on the check, including the payee information, was printed directly onto the check. *Id.* ¶ 25.

On the morning of December 19, 2018, Ms. Middleton, driving for the ride sharing entity Uber, dropped a passenger off in the affluent neighborhood of Druid Hills, which, according to the 2010 census, is 78.3% white and only 7.7% black or African American *Id.* ¶ 27, 28. As Ms. Middleton was driving around the neighborhood she noticed the Wells Fargo branch located at 725 Houston Mill Road and decided to stop and cash her refund check. *Id.* ¶ 29, 30. *Id.* ¶ 30. Prior to December 19, 2018, Ms. Middleton had

---

[1] On a motion to dismiss, the court must take the facts alleged in the complaint as true. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012).

cashed many checks at other banks, including other local Wells Fargo branches, without any issue. *Id.* ¶ 31.

On December 19, 2018, at approximately 9:30 a.m., Ms. Middleton entered the Wells Fargo branch and queued with other patrons. *Id.* ¶ 32. At the signal of the teller, Ms. Middleton approached the counter, stated that she wanted to cash a check, and presented the refund check to the teller. *Id.* The teller responded by asking Ms. Middleton for two forms of identification, which Ms. Middleton promptly provided. *Id.* ¶ 33. Ms. Middleton also complied with the teller's requests that she endorse the back of the check and place her thumbprint on the check. *Id.* ¶ 34. After complying with the teller's instructions, Ms. Middleton began patiently waiting for the teller to process her transaction. *Id.* ¶ 35.

In addition to having cashed many checks as a patron at other banks, Ms. Middleton had also previously worked for Bank of America as a teller. *Id.* ¶ 36. Ms. Middleton, familiar with the check cashing process at Wells Fargo and other banks, knew the process to be quick. *Id.* ¶ 37. However, instead of briefly inputting Ms. Middleton's information, the teller was feverously typing at her computer terminal and looking up at Ms. Middleton with an expression of repugnance. *Id.* ¶ 38. After this continued for an unusual amount of time, Ms. Middleton curiously inquired as to whether everything

3

was okay, to which the teller responded—in a reprimanding tone—that she was checking whether the refund check was fraudulent. *Id.* Although shocked to hear such a response from the teller, Ms. Middleton knew the check was authentic and, at the time, had faith that the teller would soon reach this conclusion. *Id.* ¶ 39.

Soon, though, and without explanation, the teller took Ms. Middleton's identification and the refund check and walked away from the counter. *Id.* ¶ 40. Ms. Middleton asked the teller where she was going with the check and her identification but was completely ignored. *Id.* Bewildered, Ms. Middleton waited patiently. *Id.* After further delay, Ms. Middleton was confronted by Damian Mahoney, the service manager of the branch. *Id.* ¶ 41. Without acknowledging Ms. Middleton's presence or inquires, Mr. Mahoney looked Ms. Middleton up-and-down, inspected the refund check, Ms. Middleton's identification, and proclaimed the refund check to be fraudulent. *Id.* Stunned by Mr. Mahoney's erroneous claim, Ms. Middleton offered to provide Wells Fargo with the paperwork associated with the check, which she had in her pocket, to prove it was authentic. *Id.* Wells Fargo also made and retained a copy of Ms. Middleton's identification and debit card without authority and against Ms. Middleton's will. *Id.* ¶ 42.

At this point, Blake Clark, the branch manager, confronted Ms. Middleton and instructed Mr. Mahoney to call the police. *Id.* ¶ 43. Thunder-struck not only these baseless claims—but, more critically—by Wells Fargo calling the police, Ms. Middleton began to fear for her safety. *Id.* Mr. Clark called 911 and informed the dispatcher that Ms. Middleton had "presented us a fraudulent check." *Id.* ¶ 44. After calling the police, Mr. Mahoney and Mr. Clark demanded that Ms. Middleton leave the premises. *Id.* ¶ 45. Not wanting to flee, as she had done nothing wrong, Ms. Middleton exited the branch and, in the calmest manner possible, waited outside for the police to arrive. *Id.* In short order, Officer L. Anderson arrived and, after an interrogation of Ms. Middleton and investigation, determined that the check was, in fact, not fraudulent. *Id.* ¶ 46. Wells Fargo did eventually cash Ms. Middleton's check. *Id.* ¶ 47

Wells Fargo policy allows non-account holders to cash checks drawn from a Wells Fargo account at local Wells Fargo branches. *Id.* ¶ 19. The check had substantial security features to protect from fraud and the signor of the check. *Id.* ¶ 50. It also had security features to protect against fraud, forgery, and tampering, such as specialized paper, ink, watermarks, and designs. *Id.* ¶ 51. None of the security features of the refund check were triggered or gave any indication of fraud, forgery, or tampering. *Id.* Ms. Middleton's name was

printed on the face of the check as the payee and, at the request of Wells

Fargo, produced two forms of identification and provided her thumb print and

signature. *Id.*

Mercy Housing, Inc. serves over 40,000 residents in 20 states. *Id.* ¶ 52.

Other than the amount and name of the payee, Ms. Middleton's refund check

was identical to all other checks which Mercy Housing, Inc. has issued to

other individuals for the same or similar purpose. *Id.* ¶ 53. Other white

individuals that received a refund check from Mercy Housing, Inc. were able

to cash said checks at Wells Fargo without having to endure that which Ms.

Middleton endured on December 19, 2018, at the branch in question,

including but not limited to, the weaponization of 911, unwarranted police

involvement, harassment, interruption, deterrence, false accusations of fraud,

and racial discrimination. *Id.* No explanation, other than blatant

discrimination, exists for the conduct of Wells Fargo. *Id.* ¶ 50.

Instead, what should have been a simple transaction, resulted in

accusations of fraud and an aggressive and unwarranted interrogation, and

caused Ms. Middleton to suffer deep embarrassment and humiliation. *Id.* 47

She was outraged, humiliated, and traumatized. *Id.* ¶ 48. While neither the

teller nor the managers used any racial slurs or epithets, in her experience

living as an African American, Ms. Middleton is able to identify when she is

being discriminated against on the basis of race. *Id.* ¶ 49. Ms. Middleton has

witnessed firsthand the differences in how white Americans are treated and

how black Americans are treated, and knew from the teller's facial

expression, body language, tone, language, and attitude, that she was

discriminating against her because of the color of her skin. *Id.*

## III.   Legal Standard

A complaint must contain "a short and plain statement of the claim

showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

Conversely, Rule 12(b)(6) allows for dismissal of a case when the complaint

"fail[s] to state a claim upon which relief may be granted." FED. R. CIV. P.

12(b)(6).

When evaluating a Rule 12(b)(6) motion, the court must take the facts

alleged in the complaint as true and construe them in the light most

favorable to the plaintiff. *Resnick*, 693 F.3d at 1321–22. To survive a Rule

12(b)(6) motion to dismiss, "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing

*Twombly*, 550 U.S. at 556). This requires more than mere "labels and conclusions, and a formulaic recitation of a cause of action's elements." *Twombly*, 550 U.S. at 555. The plaintiff must allege facts that "raise the right to relief above the speculative level." *Id.*

## IV.   Legal Analysis

To succeed on a § 1981 claim, the plaintiff must establish (1) that she is a member of a racial minority; (2) that the defendant had intent to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute. *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007) (citing *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004)). The plaintiff is black, so the first element is not disputed. Further, the complaint sufficiently alleges that the defendant had the intent to discriminate against the plaintiff on the basis of her race, and the defendant does not argue otherwise. Therefore, this case turns on the third element, or, as the defendant put it, whether its conduct violated the plaintiff's "right to 'make and enforce contracts.'" Mot. to Dismiss [Doc. No. 10-1] at 2 (quoting 42 U.S.C. § 1981).

Recognizing "there exists scant authority in our circuit applying § 1981 to claims brought by customers against commercial establishments," the Eleventh Circuit, when faced with this situation, uses "the Fifth Circuit's

approach in *Arguello*." *Kinnon*, 490 F.3d at 891; *see also Lopez v. Target Corp.*, 676 F.3d 1230, 1233 (11th Cir. 2012)  (finding the Fifth Circuit's reasoning in *Arguello* to be persuasive). *Arguello* stands for the proposition that, "where a customer has engaged in an actual attempt to contract that was thwarted by the merchant," a § 1981 claim exists. *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003) (quotations omitted). Conversely, when the customer "successfully completes the transaction," she has "received all she was entitled to under the retail-sales contract, [and] cannot demonstrate any loss recoverable under § 1981." *Id.* at 359. These three cases—*Kinnon*, *Lopez*, and *Arguello*—form this circuit's "scant authority" on this issue (as well as the bases of the defendant's motion), so the court finds it helpful to summarize them here.

In *Arguello*, the plaintiff and her father—both of whom were Hispanic— entered a gas station to pay for gasoline and purchase beer. *Id.* at 356–57. When Arguello approached the counter, the clerk treated her rudely, singled her out by demanding that she show identification matching the credit card she was using, and initially refused to complete the transaction. *Id.* Arguello completed the purchase; however, her father was upset at the way Arguello had been treated and left without making his purchase. *Id.* at 357. At that point, the clerk began to shout obscenities at Arguello and made

9

racially derogatory comments. *Id*. After Arguello and her father left the store, the clerk began shouting racist remarks over the intercom system, and when Arguello's father attempted to enter and determine the clerk's name, the clerk locked him out of the store. *Id*. The Fifth Circuit recognized that the first two elements of a § 1981 claim, the plaintiff's minority status and the defendant's discriminatory intent, were present. *Id*. at 358. As to the third element, however, the court found that Arguello successfully completed her transaction and was not actually denied the ability to engage in any contractual activity, and therefore could not establish a § 1981 claim. *Id*. at 358–60.

The plaintiff in *Kinnon*, who was black, entered into a contract for food delivery when she ordered lunch for a staff meeting that was to begin at 12:00 p.m. *Kinnon*, 490 F.3d at 888. Despite assurances from the restaurant that the food would soon arrive, at approximately 2:00 p.m. the food still had not arrived, so Kinnon and her coworkers left the office to eat lunch at a restaurant. *Id*. Kinnon did not call to cancel the order, and the delivery driver arrived shortly after she and her coworkers left to eat elsewhere. *Id*. An employee who stayed behind called to tell Kinnon the pizza had arrived, but she responded that it was over 2 hours late and no longer needed, so the employee sent the driver away without payment. *Id*. Almost immediately

thereafter, the owner of the restaurant began calling Kinnon in an attempt to obtain payment for the food. *Id.* at 889. He left several threatening messages filled with vulgarities and racial slurs. *Id.* Kinnon argued that she stated a § 1981 claim because the owner's discriminatory conduct arose from the restaurant owner's efforts to enforce contractual rights, but the Eleventh Circuit held, "Section 1981 does not provide a general cause of action for all racial harassment that occurs during the contracting process." *Id.* at 892. The court explained that Kinnon successfully entered into a verbal contract for the pizza delivery, and when the delivery was late, Kinnon successfully took steps to terminate the contract and ate out of the office at a restaurant. *Id.* It noted that no evidence showed the delivery was delayed because of her race, so "Kinnon's exercise of her contractual rights was not in some way thwarted." *Id.*

In *Lopez*, a Hispanic male went to a Target store, selected some items for purchase, and proceeded to a check-out line. *Lopez*, 676 F.3d at 1231. Lopez waited about five minutes to reach the front of the line, but when he got there the cashier stated that her register was closed. *Id.* When Lopez hesitated, the cashier again told him, in a very rude tone, that her register was closed; however, after Lopez left the register the cashier proceeded to serve the next customer in line. *Id.* As Lopez walked away, the cashier was

laughing and gesturing toward Mr. Lopez. Upset and humiliated, Lopez

headed toward another check-out line, but he was stopped by a supervisor,

who told him that the original cashier would accept payment for his

purchases and that he should go back to her line. *Id.* Lopez returned to the

same line and waited again, but when he reached the front of the line, the

cashier reiterated that she was closed before clarifying, in a very loud voice,

"Don't you understand? I'm closed to YOU!' " *Id.* at 1232. Lopez proceeded to

a different register, paid for his items, and, after telling that cashier what

had transpired, received an apology and $9 in coupons from the supervisor.

*Id.* The Eleventh Circuit was not persuaded by the fact that the cashier twice

rejected Lopez's offer to contract, forcing him to complete his transaction with

a different cashier. *Id.* at 1235. It held, "Lopez was not attempting to contract

with [the specific cashier] directly. Plainly, he was attempting to contract

with Target, and he was successful in that endeavor." *Id.* (further explaining,

"Because Lopez was able to make his desired purchase from Target, on the

same terms available to any other customer, [the cashier's] discriminatory

conduct did not impair Lopez's right to make contracts under § 1981.").

Relying on the three cases above[2]—particularly *Lopez*—the defendant

bases its argument around the allegation in the complaint, "Wells Fargo did

eventually cash Ms. Middleton's check." It claims that because  the plaintiff

was not prevented  from cashing her check on December 19, 2018, her right

to make and enforce a contract was not impaired, so her § 1981 claim fails as

a matter of law. Mot. to Dismiss [Doc. No. 10-1] at 2-3. The defendant asserts

the claim fails because "Plaintiff has not alleged  that she had to pay a

different amount than others who cashed checks at Wells Fargo, that she had

to use a different form of payment, or even that she had to go to a different

Wells Fargo branch to cash the check.  Instead, Plaintiff rests her Section

1981 claim on allegations that she was delayed and mistreated." *Id.* at 5.

But this matter is not as simple as the defendant tries to make it seem.

As the plaintiff points out, she was not able to quickly complete her

transaction after some harassment—as in *Arguello*—nor did she take steps to

terminate the transaction, only to suffer racial harassment thereafter—like

---

[2] The defendant also relies on the undersigned's decision in *Rogers v. Elliott*, 135 F. Supp. 2d 1312 (N.D. Ga. 2001). That decision involved a white cashier accusing two young black males of stealing candy that they were holding— and preparing to eat—while walking out of the store after paying for the candy at a different register. *Rogers* is inapposite because all of the racial harassment at issued occurred after the contract was completed.

in *Kinnon*. Here, she was actually refused service, like the plaintiff in *Lopez*, and the court finds that case is most analogous. It is also distinguishable.

The defendant's teller refused to complete the plaintiff's transaction, just like Target's cashier did to Mr. Lopez. The plaintiff, however, was not able to go to another teller and complete her transaction. Not only did the teller refuse to cash the plaintiff's check, Damien Mahoney, the service manager, and Blake Clark, the branch manager, likewise refused. This further differentiates the case at bar from *Lopez*, where the court noted that Mr. Lopez was not attempting to contract with a specific cashier, but with Target in general. This leads the court to the most compelling difference: the plaintiff was asked to leave the branch, and the police were called to, presumably, arrest her if she refused. The Eleventh Circuit noted in *Lopez*, albeit in dicta, "We are not faced here with circumstances where a customer was refused service by the retail store, was required to contract on different terms, got frustrated and left the store, or was in any other way denied the right to make, enforce, or terminate a contract." *Lopez*, 676 F.3d at 1235 (11th Cir. 2012). But here, the court is faced with those circumstances. The branch in its entirety—from teller to service manager to branch manager—

14

refused to contract with the plaintiff, told her to leave, and only cashed the

check once law enforcement determined it was not fraudulent.[3]

The defendant attempts to downplay this, repeatedly pointing out that

§ 1981 does not provide a general cause of action for all racial harassment

that occurs during the contracting process, and that the branch did, at some

point, cash the check. But it only did so because the plaintiff waited outside

for the police, instead of leaving like she was told to do by the branch

manager. Only after the officer's investigation concluded that the check was

not fraudulent, did the defendant, inexplicably, alter course and cash the

plaintiff's check. Viewing these allegations in the light most favorable to the

plaintiff, she attempted to contract with the defendant on two separate

occasions that day. The first time, the defendant thwarted her attempt when

it unequivocally refused to cash the refund check and ordered her to leave the

premises or face criminal charges. The fact that she was successful in her

second attempt is immaterial.[4]

---

[3] The defendant contends that although the complaint alleges that the
officer's investigation determined the check was not fraudulent, there is no
indication that this had any bearing on the decision to ultimately cash the
plaintiff's check. The court, however, if free to make reasonable inferences
arising out of the allegations in the complaint.
[4] The plaintiff filed a notice of supplemental authority [Doc. No. 28], to which
the defendant responded [Doc. No. 29], pointing the court to a similar case
against Wells Fargo in the Northern District of California, as well as Justice

## V.     Conclusion

The defendant's motion to dismiss and to strike certain allegations

from the complaint [Doc. No. 10] is GRANTED IN PART. Paragraphs 63

through 83 of the plaintiff's complaint are STRICKEN. The remainder of the

defendant's motion is denied.

**SO ORDERED** this 24th day of July, 2020.


/s/CHARLES A. PANNELL, JR.
CHARLES A. PANNELL, JR.
United States District Judge

---

Ginsburg's opinion concurring in part and concurring in judgement in
*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009
(2020). These authorities discuss a line of cases which hold that even
successful contract formation, if burdened in its initial phase by additional
conditions that were not imposed on others, violates § 1981 if those additional
conditions were imposed because of race. The court, however, needs not
address these authorities, as the allegations before it indicates the plaintiff
was thwarted on her first attempt to contract with the defendant.

16